In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00418-CV

**ROBERT E. MIZELL, JAMES M. MIZELL, BRUCE W. MIZELL, KENNETH H. MIZELL, AND JOHN D. MIZELL, Appellants**

**V.**

**DIANNE GRIFFITHS, SHIRLEY STEELE, JUDY FRIEND, AND MARY WHISENANT, Appellees**

_____

**On Appeal from the 258th District Court**
**San Jacinto County, Texas**
**Trial Cause No. CV17,109**

_____

**MEMORANDUM OPINION**

Robert E. Mizell, James M. Mizell, Bruce W. Mizell, Kenneth H. Mizell, and John D. Mizell (collectively "Plaintiffs" or "Appellants") appeal the trial court's summary judgment in favor of Dianne Griffiths, Shirley Steele, Judy Friend, and Mary Whisenant (collectively "Defendants" or "Appellees") in the Plaintiffs' trespass to try title action against the Defendants. The parties' dispute pertains to an undivided portion of a 6.918-acre tract of real property otherwise described in that

1

certain 1966 Deed from Claude Lewis, et ux. to Billy W. Pouncey and Emma Jean Pouncey, recorded at volume 99, page 420 of the San Jacinto County Deed Records. For the reasons explained below, we affirm the trial court's judgment.

Background[1]

<u>Plaintiffs' Original Petition</u>

On April 13, 2022, Plaintiffs filed their Original Petition for suit for trespass to try title, quiet title, adverse possession, tacking, declaratory judgment, and attorney's fees, claiming ownership of what they stated is property located at what is "commonly known as, 431 McAdams Vann Rd., Cleveland, Texas 77328" (hereinafter the "Property"). The Original Petition included the following alleged facts, in pertinent part:

> [] The [] Property has not been subdivided. The "Sections" indicated by numbers [on Exhibit 1-A] is designed for the purpose of

---

[1] Appellants have appealed the trial court's Final Judgment only to the extent that the trial court granted summary judgment in favor of Appellees regarding their ownership of Sections 1 and 2 of the Property. Plaintiffs attached to their petition a drawing on an aerial photo which they allege is labeled to indicate five sections on the Property, and they argue on appeal that they are only seeking ownership of Sections 1 and 2 of the Property. Accordingly, we have, when possible, limited our discussion of background facts, allegations, and portions of pleadings and evidence to that which pertains to what the Plaintiffs labeled or referenced as Sections 1 and 2 of the Property. We note however, that the Property has never been subdivided or partitioned, and according to a 2022 survey of the 6.918-acre tract which was attached as Exhibit B to a motion to designate experts, the 6.918-acre tract has various improvements including a one-story wood-frame home on blocks with a shed on one part of the Property, a manufactured home on blocks on one part of the Property, and another one-story wood-frame on slab on one part of the Property, as well as certain perimeter and cross fencing between the structures.

referencing use by certain parties and family members as further described below.

[] On or about the year 1966, Jimmie and Helen [Mizell] purchased the [] Property with Jimmie's sister Emma Jean Pouncey and her husband, Bill Pouncey.

[] The family decided to pool resources and decided that Bill would take out a loan for the purchase of the land and that Jimmie and Helen would make more than half the payments on the mortgage until the mortgage was paid in full. Helen's mother sold two houses in order to divide up the proceeds amongst her children. Helen's mother provided Helen with a third of the sale proceeds, which Helen used as a down payment for the purchase of the [] Property. Both Jimmie and Helen paid the taxes on the [] Property.

[] The mortgage was paid in full on or about 1976.

[] Since on or about 1966, Jimmie and Helen [Mizell] and Emma Jean and Bill moved onto the property identified as Section 1 of the Satellite Image. Then, on[] or about a date after 1969, Jimmie and Helen [Mizell] exclusively used Sections 1, 2, and 4 for over 25 years.

[] At the time of purchase, there was one house on the [] Property, which was the residence for Jimmie and Helen. The house was located on Section 1. Jimmie and Helen resided at the property on Section 1. Jimmie and Helen resided at the property until the time of their death. Jimmie [Mizell] passed away on or about November 20, 2019. Helen [Mizell] died in a car accident at 60 years old on or about April 10, 2002.

[] About two weeks after the purchase of the property, Emma Jean and Bill [Pouncey] moved a "trailer" onto Section 4. Then, approximately[] 2 years later, around 1968, Emma Jean and Bill moved their trailer to Section 3 and lived on Section 3 until the time of his death. Emma Jean moved off the property toward the end of her life when she passed away at a nursing home. Emma Jean passed away December 18, 2014. Bill Pouncey passed away on or about the year 2004.

[] Jimmie and Helen Mizell were in actual peaceable, visible appropriation of Sections 1 and 2 of the [] Property that was open and notorious and commenced and continued under a claim of right that was inconsistent with and hostile to the claim of any other person from the year 1966 to the date of their deaths.

[] Jimmie and Helen Mizell were in actual peaceable, visible appropriation of possession of Sections 1, 2, 4 & 5 of the [] Property

3

that was open and notorious and commenced and continued under a claim of right that was inconsistent with and hostile to the claim of any other person from the year 1969 to the date of their deaths.

[] Jimmie and Helen were survived by five sons: James Michael [Mizell], Kenneth Harlen [Mizell], Bruce Wayne [Mizell], John Douglas [Mizell], Robert Earl [Mizell].

[] Emma Jean and Bill were survived by four daughters (the Defendants): Dianne Griffiths, Shirley Steele, Judy Friend, and Mary Whisenant. After the Defendants became adults, they moved off Section 3. Shirley temporar[il]y resided in Section 3 of the [] Property as an adult from 1979 until 1980.

[] None of the Defendants resided at the [] Property at any time after the deaths of their parents, Bill and Emm[a] Jean.

[] After Jimmie and Helen passed away, their children James Michael [Mizell], Kenneth Harlen [Mizell], Bruce Wayne [Mizell], John Douglas [Mizell], [and] Robert Earl [Mizell] maintained the [] Property (excluding Section 3) and have continuously asserted their ownership interest claim to the [] Property (Excluding Section 3).

[] In August 2015, when Jimmie [Mizell] was still alive, his son Bruce [Mizell] moved back to Section 2 and continues to maintain Section 2. After the deaths of their parents, one [Mizell] brother or another would live [] on Section 1 & 2, while maintaining Section 4 & 5. The [Mizells] and the [Mizell] brothers have maintained the landscaping, kept cattle, planted vegetation and grass, and fertilized Sections 1, 2, 4 & 5. The [Mizells] paid the taxes on the real property.

In their Original Petition, Plaintiffs asserted that they are the legal and equitable owners of the Property under "privity of estate, privity of possession, and tacking of adverse possession." Plaintiffs alleged that they are the owners of the Property with the exclusion of Section 3 due to adverse possession:

[] During Jimmie and Helen Mizell's and Plaintiffs' occupation of the [] Property (excluding Section 3), no person, Defendants or otherwise, has claimed or attempted to claim any interest in the [] Property. Jimmie and Helen Mizell have claimed the [] Property as their own for a period exceeding 25 years and was continuously adverse to Defendants' claim to the [] Property. Jimmie and Helen Mizell

4

maintained continuous bare possession, dominion and control of the []
Property (excluding Section 3) and had established a general reputation
for owning the land prior to their children inheriting; so, the Court may
infer the existence of a lost grant. *See Conley v. Comstock Oil & Gas,
LP*, 356 S.W.3d 755, 765 (Tex. App[.—]Beaumont 2011, no
pet.)[][](quoting *Magee v. Paul*, [] 221 S.W. 254, 255-57 (Tex. 1920)).

[] For over 25 years and continuing until Jimmie and Helen's
children inherited their portion of the [] Property and begin to use same,
Jimmie and Helen's possession of the [] Property has consisted of:
        a. improving and maintaining a house and/or mobile home
located there;
        b. cultivating the landscaping; and
        c. personally residing there for over 25 years.

Plaintiffs alleged that because they are successive adverse possessors, they may

"tack" their periods of successive possession to accumulate the necessary time of

possession required under the limitations period. Plaintiffs sought a declaratory

judgment under Section 37 of the Texas Civil Practice and Remedies Code against

Defendants to declare Plaintiffs as the true title holders of the Property with the

exclusion of Section 3 and that Plaintiffs are the sole legal and equitable owners of

the Property with the exclusion of Section 3. Plaintiffs requested attorney's fees

under Chapter 37 and demanded a jury trial.

Defendants' Answer and Motion for Summary Judgment

Defendants answered and filed a Motion for Summary Judgment. In

Defendants' no-evidence and traditional motion for summary judgment, the

Defendants allege that Bill and Emma Jean Mizell Pouncey purchased the Property

in 1966, immediately moved on to the Property, and allowed Emma Jean's brother,

Jimmie Mizell, and Jimmie's wife, Helen, to live on the Property. According to the motion, each of the four individuals lived on the Property until their death or until they needed to live in an assisted living facility immediately preceding their death. The motion included the following dates of death: Helen Mizell – April 10, 2002; Bill Pouncey – May 2, 2007; Emma Jean Mizell Pouncey – December 18, 2014; and Jimmie Mizell – November 20, 2019. In the motion, the Defendants allege that after Jimmie died in 2019, his children filed this suit against the Defendants, their cousins, claiming title of certain parts of the Property under a theory of adverse possession, but that summary judgment is proper because the facts conclusively negate at least one element of the Plaintiffs' adverse possession claim. Defendants allege in their motion for summary judgment that there is no evidence that Jimmie or Helen or Plaintiffs adversely possessed the Property or any portion of the Property.

As summary judgment evidence, Defendants attached as exhibits to the motion a 1966 Deed, an Affidavit of Mary Whisenant, and a copy of the transcript from James Mizell's May 4, 2023 deposition. The deed provides that the Property was sold and conveyed to Billy W. Pouncey and his wife, Emma Jean Pouncey, in 1966, and they paid the note on the Property off in 1975. In Mary Whisenant's affidavit, she avers as follows:

> I am over the age of twenty-one years old, and I have personal
> knowledge of the facts stated in this affidavit. I am an adult child of the
> late Emma Jean Mizell Pouncey and Bill Pouncey.

6

Helen Mizell passed on or about April 10, 2002, in a car accident. Bill Pouncey passed away on or about May 2, 2007. Emma Jean Mizell Pouncey passed away on or about December 18, 2014. Jimmy Mizell passed away on or about November 20, 2019.

My parents lived on the Property from the time they purchased the Property in 1966 until immediately prior to the date of their deaths.

For as long as 69+ years, no one has ever attempted to exclude myself or my siblings from use of any portion of the Property at issue in the above-entitled cause of action.

The copy of James Mizell's deposition transcript reflects that James, one of the Plaintiffs and the oldest son of Jimmie and Helen Mizell, testified that the Property was identified in this lawsuit as including five different sections for purposes of identifying "who lived where." According to James, the deed to the Pounceys is the only deed he is aware of for the Property. James testified that two or three months after James's father died in November of 2019, James's nephew (Plaintiff Robert Mizell's son) moved into the house on Section 1 that is the same house that his parents lived in from 1966 until shortly before they died, and his nephew still lived in that house at the time of the deposition. According to James, he moved a mobile home onto Section 2 in 1981 and lived there until 1987; then the mobile home was vacant for a few years before James's brother Bruce and Bruce's wife lived there for four or five years; then his brother John and John's wife lived there from the Spring of 2020 until sometime in 2022; and, then John's mother-in-law moved in and was still living there at the time of the deposition. James recalled that in 1981 when he

7

moved the mobile home on Section 2, the Pounceys were both still alive and they had no problem with him putting the mobile home on Section 2. James testified that in 1981, his parents were living in the house on Section 1, and his parents had always "got[ten] along" with the Pounceys. According to James, when he moved the mobile home onto Section 2 in 1981, the lender wanted a deed for an acre and James knew the land was in Bill and Emma Jean Pouncey's name and Bill Pouncey told him that the only reason "it's like it is, nobody is going to pay $500 to get it surveyed. It wasn't worth it." James testified that Bill Pouncey told him that if James surveyed it, "that would be fine but then you have to do everything[,]" and James just told him, "well, we'll get around it." According to James, in 1966, when he was five years old, Bill and Emma Jean Pouncey and James's parents decided that Bill would take out a loan for the purchase of the Property and that James's parents would make more than half of the payments until the mortgage was paid off, but to James's knowledge the agreement was never put in writing. James testified that Helen's mother sold two houses and divided up the proceeds among her children, and Helen used her one third of the proceeds for a down payment on the Property in 1966. James recalled that he was pretty sure that there would be some sort of receipt for that down payment, but that he did not know the whereabouts of such a receipt. James testified that prior to 2008, he believes his parents would sometimes pay the taxes on the Property and then in other years, he thinks the Pounceys would pay the

taxes on the Property. According to James, he or his brothers have paid the taxes on the Property since 2008 and have never asked for reimbursement from the Pounceys or their children for the taxes. James explained that his parents and Bill and Emma Jean Pouncey had a good relationship, the families never had problems being together on the land, and James agreed that "they both had permission to be there[.]" As for the assertion in the Original Petition that the Mizells had adversely possessed the Property, James testified that neither he, nor to his knowledge, his brothers, ever notified the Pounceys of an intent to adversely possess the Property.

In Defendants' Motion for Summary Judgment, the Defendants allege that no evidence exists that Jimmie and Helen Mizell adversely possessed the Property or any portion of the Property. According to Defendants, Plaintiffs have provided no evidence of an alleged agreement between Jimmie and Helen Mizell and Bill and Emma Jean Pouncey that the Mizells would help pay the mortgage until it was paid off, and even if such agreement existed, Jimmie and Helen Mizell resided on the Property with the permission of Bill and Emma Jean Pouncey (the title owners), and that even if the two couples were cotenants, Plaintiffs cannot establish that Jimmie and Helen Mizell ousted the Pounceys prior to their deaths. The Defendants maintain that Plaintiff James Mizell's testimony conclusively negates any alleged ouster because he testified that his parents had never attempted to prevent the Pounceys from using any portion of the land at any time. Defendants argue that without

9

evidence that an agreement existed between the Pounceys and Jimmy and Helen Mizell regarding the purchase of the Property, that only leaves the adverse possession claim and they have no evidence of repudiation of permission to be on the Property, which is required by a permissive occupant of land to deny the owner's title. According to Defendants, James's testimony conclusively negates Plaintiffs' claim for adverse possession because he testified that his parents had permission to be on the land. Defendants further assert that because Plaintiffs' entire claim of adverse possession is based on their predecessor in title's possession of the Property because Plaintiffs did not obtain any alleged possession until Jimmie Mizell's death in 2019, Plaintiffs must tack their time of possession to that of Jimmie and Helen Mizell in order to prevail on their adverse possession claim. Defendants argue that because no evidence exists that Plaintiffs' predecessors possessed the Property adversely, there is nothing to which Plaintiffs can tack their claim of adverse possession.

Plaintiffs' First Amended Petition

Plaintiffs filed their First Amended Petition, making similar allegations to their Original Petition and seeking a declaratory judgment, but limited their claim to title under adverse possession/tacking only as to Sections 1 and 2, thereby abandoning their previously pled ownership claims as to Sections 4 and 5, and adding a claim to title of Sections 1 and 2 pursuant to the lost deed doctrine in the

alternative to their adverse possession/tacking claims. Plaintiffs alleged that the lost deed doctrine is a common-law form of adverse possession where the existence of a lost deed in favor of a party who has claimed ownership for a long time is presumed.

<u>Plaintiffs' Response to Defendants' Motion for Summary Judgment</u>

A few hours after filing their First Amended Petition, Plaintiffs filed a Response to Defendants' Motion for Summary Judgment and in the Response Plaintiffs state they attached the following evidence as summary judgment evidence: Affidavit of James M. Mizell, a demonstrative drawing of the Property, a copy of a transcript of Shirley Steele's deposition, and copies of historical deed records.[2] According to Plaintiffs' Response, after Defendants filed their summary judgment motion, Plaintiffs amended their petition to clarify that they claim title to Sections 1 and 2 of the Property pursuant to the lost deed doctrine. Plaintiffs argued that Helen

---

[2] In their Response, although Plaintiffs list five exhibits in support of their Response, those exhibits are not attached to the Response dated December 6, 2023, which is in our appellate record. However, we note that the first four exhibits listed apparently were also attached to Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment which Plaintiffs filed on March 14, 2024, and, because Defendants' Reply to the Response addresses the first four exhibits, we include a discussion of those four exhibits. However, the fifth exhibit listed as evidence in support of the Response and also listed as evidence in support of Plaintiffs' Response to Defendants' Response to Defendant's Motion for Partial Summary Judgment— the item that Plaintiffs called a purported "Abstract of Title filed with the court on September 8, 2022, to which Plaintiffs request the court to take judicial notice[,]"— is not attached to either of the Plaintiffs' Responses referencing the exhibit and is not otherwise included in our appellate record. That said, we do find an abstract of title in the record which was filed by the Defendants on July 11, 2022.

Mizell used and occupied Section 1 for more than 36 years and Jimmie Mizell used and occupied Section 1 for more than 53 years and used and possessed Section 2 for more than 50 years, and that they have established ownership to Sections 1 and 2 under the lost deed doctrine and adverse possession.

In his sworn affidavit, James Mizell stated the following:

> My name is James M. Mizell. I am of sound mind, over eighteen (18) years of age, and am authorized and competent to make this Affidavit. I have never been convicted of a felony, and I have personal knowledge that the facts stated in this Affidavit are true and correct.
>
> I am a Plaintiff, along with my four brothers, Robert Mizell, Bruce Mizell, Kenneth Mizell, and John Mizell, in the above-referenced lawsuit concerning real property located in San Jacinto County, Texas, commonly known as 431 McAdams Vann Rd., Cleveland, Texas 77328 (hereinafter referred to as the "Property"). The Property has five (5) distinct sections (each a "Section") identified on the Satellite Image included herein as Exhibit A-1. My parents were Jimmie and Helen Mizell, now deceased.
>
> On or about the year 1966, my parents, Jimmie and Helen Mizell, purchased the Property with Jimmie's sister, Emma Jean Pouncey, and her husband, Bill Pouncey.
>
> Jimmie and Helen Mizell decided to pool resources with Bill and Emma Jean Pouncey so that the Pounceys could take out a loan for the purchase of the land. Jimmie and Helen would make more than half the payments on the mortgage until the mortgage was paid in full. My grandmother, Helen's mother, sold two houses in order to divide up the proceeds amongst her children. Helen's mother provided Helen with a third of the sales proceeds, which Helen used as a down payment for the purchase of the Property. Both Jimmie and Helen paid the taxes on the Property.
>
> At the time of purchase, there was one house on the Property, which was in Section 1 shown on Exhibit A-1. In 1966, Jimmie and Helen Mizell and Emma Jean and Bill Pouncey moved onto Section 1 of the Property where Jimmie and Helen Mizell took ownership of the house. Then, on or about a date after 1969, Jimmie and Helen Mizell exclusively used and occupied Sections 1 and 2 for over 53 years and

12

36 years respectively, through the dates of their deaths. Jimmie Mizell died on or about November 20, 2019, and Helen Mizell died on or about April 10, 2002.

About two weeks after the purchase of the Property, Emma Jean and Bill Pouncey moved a mobile home or "trailer" onto Section 4. Approximately 2 years later, around 1968, Emma Jean and Bill moved the trailer from Section 4 to Section 3. Bill lived on Section 3 until the time of his death in or around 2007. Emma Jean moved off Section 3 of the property toward the end of her life and died at a nursing home on or about December 18, 2014.

My parents, Jimmie Mizell and Helen Mizell were in actual peaceable, visible appropriation of possession of Sections 1 and 2 of the Property, which was open and notorious and commenced and continued under a claim of right that was inconsistent with and hostile to the claim of any other person from the year 1966 for Section 1 and 1969 for Section 2 to the date of their deaths. My parents and Bill and Emma Jean Pounc[e]y shared use of Sections 4 and 5. Because my parents owned Sections 1 and 2, they never needed to pay rent to anyone, and they never did.

Jimmie and Helen were survived by five sons: James Michael Mizell, Kenneth Harlen Mizell, Bruce Wayne Mizell, John Douglas Mizell, [and] Robert Earl Mizell.

Emma Jean and Bill were survived by four daughters (the Defendants): Dianne Griffiths, Shirley Steele, Judy Friend, and Mary Whisenant. After the Defendants became adults, they moved off Section 3. Shirley Steele temporarily resided on Section 3 of the Property as an adult in the early 1980s. Apart from Shirley Steele, none of the Defendants resided on the Property at any time after the deaths of their parents, Bill and Emma Jean.

After the deaths of their parents, one Mizell brother or another would live on Sections 1 and 2, while maintaining Sections 4 and 5. I, exclusively, lived on Section 2 of the Property from 1981 through 1987, and a Mizell brother or family member occupied or exclusively controlled Section 2 since that time. The Mizell family has maintained the landscaping, planted vegetation and grass, and fertilized Sections 1, 2, 4, and 5. The Mizells have paid the taxes on the real property periodically throughout the years, but exclusively after Bill Pouncey's death in 2007.

My brothers and I claim ownership of Sections 1 and 2 of the Property (and all interest that my parents had in sections 4 and 5) through inheritance and/or adverse possession.

Since the mid-1960s and after Jimmie and Helen Mizell took possession and physical use of Sections 1 and 2, none of the Defendants nor Emma Jean Pouncey and her husband, Bill Pouncey, made any attempt to interrupt the Mizells' continuous use of Sections 1 and 2, prior to 2020.

Since the mid-1960s and after Jimmie and Helen Mizell took possession and physical use of Sections 1 and 2, none of the Defendants nor Emma Jean Pouncey and her husband, Bill Pouncey ever made any attempt to institute an adverse suit prior to 2020 to recover Sections 1 or 2.

Since the time that Plaintiffs began to use Sections 1, 2, 4 and 5, none of the Defendants made any attempt to institute an adverse suit, prior to 2020, to recover 1, 2, 4 and 5.

Additionally, on May 4, 2023, I provided testimony in a deposition where I used the word permission, but I did not use the word in the way that Defendants' counsel attempts to use my testimony in his Motion for Summary Judgment. At no time in the deposition did Defendants' counsel ask me if the Pounceys gave the Mizells "permission" to live in Section 1 or 2. When I used the word "permission" on Page 20 of my deposition, I meant the <u>agreement</u> between Bill and Emma Jean Pouncey [and] my parents, Jimmie and Helen Mizell, where it was agreed that my parents would live on and own Sections 1 and 2 of the Property and the Pounceys would live on Section 3 and use Sections 4 and 5. I never heard the Pounceys give "permission" to the Mizells to live on Sections 1 and 2, but instead the families had an agreement on who would own and use certain areas of land.

In his sworn affidavit, William Dewayne Mizell stated the following:

My name is William Dewayne Mizell. I am of sound mind, over eighteen (18) years of age, and am authorized and competent to make this Affidavit. I have never been convicted of a felony, and I have personal knowledge that the facts stated in this Affidavit are true and correct.

I am the uncle of the five Plaintiffs, James Mizell, Robert Mizell, Bruce Mizell, Kenneth Mizell, and John Mizell, in the above-

referenced lawsuit concerning real property located in San Jacinto County, Texas, commonly known as 431 McAdams Vann Rd., Cleveland, Texas 77328 (hereinafter referred to as the "Property").

Jimmie Mizell and Emma Jean Mizell Pouncey were my brother and sister. Our parents were Marie and Bill Mizell. I lived with my parents until I was drafted into the Army in October 1965 at the age of 18, so I have firsthand knowledge concerning the Property. Most family events and discussions occurred at my parents' home, including those about the Property.

This Property was once owned by Bessie and Claude Lewis who wanted to sell it.

My father, Bill Mizell wanted land for Jimmie and Emma Jean to raise their families, so he met with Kenneth Riggs, a banker in town, about securing a loan to purchase the Property.

Helen Mizell's mother, Myrtle Richardson, was planning to provide the down payment for the Property with the proceeds from two of the houses she sold in New Hampshire. Helen is Jimmie Mizell's wife.

From family discussions, I understood that the land would be owned and used equally by both Jimmie's and Emma Jean's families. Each would essentially have half the Property and they would determine which areas they would use and reside on.

I was drafted into the Army in October 1965, just prior to the purchase of the Property. My mother, Marie Mizell wrote to me in a letter that Jimmie, Helen, Emma Jean, and Bill had purchased the Property and Jimmie and Helen were living in the house on the Property.

I returned from Vietnam in 1967. By that time, everyone had settled in on the Property. Jimmie and Helen lived in the house. Emma Jean and Bill Pouncey lived in a trailer that they had moved onto the Property.

I spent a lot of time on the Property. Everyone got along and used the Property as they needed. Both families originally cultivated a garden together in the vicinity of Sections 4 and 5 sharing the harvest.

During the time that the families and their children lived together on the Property, Jimmie and Helens's home was considered the gathering place for meetings, dinners, celebrations, storm shelter, and the like. This included all members of the Mizell and Pouncey families living on the Property.

Jimmie worked the Property and ran cattle on it for a period of time. He generally maintained it since he was home every day. Jimmie built a barn for this purpose that still stands today. Bill Pouncey worked for Butler Drilling Company in the oil industry and was out-of-town most days during the week for many years.

When taxes were due, I understood that everyone pitched in to get them paid. I spoke with my brother Jimmie every Wednesday until his death, so I knew most things going on in the family and around the Property.

I cannot remember a time that the Mizells and Pounceys ever considered, stated[,] or took an action that indicated that both families did not equally own the Property. It was in 2022 when the Pouncey daughters attempted to evict the Mizell brothers from the Property. This was a shock and sincerely hard for me to believe.

In Shirley Steele's deposition on November 8, 2023, she testified that her cousins had filed this lawsuit against her and her three sisters to determine title to the Property. According to Shirley, she does not believe her cousins, the Mizell brothers, have an ownership interest in the Property. She stated that she did not know whether the Mizell brothers' parents had an ownership interest in the Property at one time or another. Shirley testified that she lived with her mother and father in a trailer home on Section 4 of the Property from 1964, when she was in the third grade, and the trailer was moved to Section 3 when she was around ten years old, and then she moved out when she graduated in 1977. For about a year in 1982, she moved back into the trailer house on Section 3 of the Property with her then-husband and child. Shirley testified that her father died around 2004 and her mother died in 2014, and years before her mother passed away, Shirley and her sisters moved their mother from the Property into a nursing home. Shirley recalled that at some point Jimmie

16

and Helen, her uncle and aunt, moved on to Section 1 of the Property but she could not remember the exact time frame because she was too young to remember. Shirley remembered that Jimmie and Helen used Section 2 along with her parents, and Jimmie kept a horse on that section. Shirley testified that Jimmie and Helen resided on Section 1 until they died and no one ever tried to kick them off the Property. Shirley did not have any opinion as to whether Jimmie and Helen purchased the Property together with Shirley's parents, and she did not know how her parents purchased the property, whether Jimmie and Helen contributed to pay the purchase price of the Property or ever paid rent to Shirley's parents, or whether Jimmie and Helen ever helped to pay the taxes on the Property. Shirley believed, based on canceled checks and receipts from San Jacinto County she found at her mother's house after her mother died, that her mother had paid the property taxes on the Property the last ten years of her life but she did not know exactly in which years the taxes were paid by her mother. According to Shirley, the Plaintiffs had not paid any rent to her to live on the Property, but she did not know if the Plaintiffs had paid any rent to her sisters to live at the Property. Shirley testified that prior to 2020, no one in the Pouncey family attempted to remove anyone from the Mizell family from the Property, and she did not ask or demand any Mizell family member to leave the Property. Shirley recalled that she had never paid property taxes for the Property and she did not know if her sisters or the Plaintiffs had ever paid property taxes for the

Property. Shirley testified that she never tried to evict the Plaintiffs from the Property, she never had a conversation with any of the Plaintiffs asking them to get out, and she did not know about any attempts to evict the Mizells from the Property. According to Shirley, when she, her husband, and sisters visited her mother's house on Section 2 two or three years ago to clean up around her mother's house and trim trees, no one was living on Section 2, and when asked if she cleaned up Section 1 during that time, Shirley answered, "No, we didn't touch that part." Shirley recalled that none of the Pounceys lived with the Mizells on Section 1 at any time, and Jimmie and Helen lived in peace with the Pounceys on the Property when they lived there. Shirley testified that Bruce has a home on Section 2, but she does not know who currently lives in the home. Shirley agreed she had always gotten along with the Plaintiffs. She explained that she believes that she owns Section 1 with her sisters based on the deed of the Property to her parents, and she knew of no contract or loan documents indicating that her parents and the Mizells agreed to buy the Property together. According to Shirley, she grew up playing on all of the Property and no one has ever told her she is not permitted to be on any of the sections of the Property.

Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment

Defendants filed a Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment. In their Reply, Defendants objected to James Mizell's affidavit, arguing that James's affidavit conflicts with his deposition testimony regarding a

18

necessary element of his adverse possession—whether he and his family had permission to be on the property—and he does not provide a sufficient explanation for the conflict. The Defendants argue that under the "sham affidavit rule" the trial court may disregard the affidavit when deciding whether the Plaintiffs raised a genuine fact issue to avoid summary judgment. The Defendants also objected to James's affidavit on the grounds that he failed to show any basis for personal knowledge regarding the stated facts because his deposition demonstrates that he was five years old in 1966, and he was too young to have competent personal knowledge of any agreement. According to the Defendants, James's affidavit should be struck because James provides no basis for personal knowledge regarding any facts or any explanation of where he got his information from. Defendants also objected to paragraphs 4-9 of Plaintiffs' Reply because these paragraphs are not supported by admissible evidence and rely solely on Mizell's affidavit that provides no basis or explanation regarding how he has personal knowledge of the statements he makes in these paragraphs.

In Defendants' Reply to Plaintiffs' Response, they assert that Plaintiffs have failed to address the element of adverse possession that the claim of right must be inconsistent with and hostile to the claim of another person. According to the Defendants, the Plaintiffs cannot claim that they or the Mizells have adversely possessed property that they contend was jointly purchased with the Pounceys

without establishing ouster of the cotenants, which they did not do in their Response to Defendants' Motion for Summary Judgment. The Defendants also argue that Plaintiffs' argument that Plaintiffs' and Defendants' parents agreed to purchase the disputed property together establishes that there was no hostile possession of the property because there was no intention to claim the Property as one's own to the exclusion of all others. Defendants assert that no document exists or person with knowledge is alive that has any personal knowledge regarding any agreement that the Mizells purchased any portion of the Property, and that the evidence only shows that "a sister purchased land with her husband and lived on the land with her brother and his family." Defendants contend that under adverse possession law, mere use of property is insufficient to establish possession and there is no admissible evidence that Jimmie and Helen ever had hostile or exclusive possession of the Property. As for Plaintiffs' new lost deed doctrine claim, Defendants explained that the addition of this claim converted Defendants' previous Motion for Summary Judgment into a partial motion for summary judgment and Defendants would address Plaintiffs' new lost deed doctrine claim in another motion.

Plaintiffs' Second Amended Petition

Plaintiffs filed their Second Amended Petition alleging ownership under adverse possession/tacking and the lost deed doctrine, but Plaintiffs changed their

20

claim to title to now add Section 4 to their claims to title of Sections 1 and 2 in their

First Amended Petition. Plaintiffs specifically pled, in pertinent part, the following:

[] Helen Mizell used and occupied Section 1 for more than 36 years. Jimmie Mizell used and occupied Section 1 for more than 53 years and used and possessed Sections 2 and 4 for more than 50 years.

. . . .

[] . . . After the Defendants became adults, they moved off Section 3. Shirley temporar[il]y resided in Section 3 of the [] Property as an adult from 1979 to 1980.

[] None of the Defendants resided at the [] Property at any time after the deaths of their parents, Bill and Emm[a] Jean.

[] After Jimmie and Helen died, their children [the Plaintiffs] maintained the [] Property (excluding Section 3) and have continuously asserted their ownership interest claim to Sections 1, 2 and 4.

[] In August 2015, when Jimmie Mizell was still alive, his son Bruce Mizell moved back to Section 2 and continued to maintain Section 2. After the deaths of their parents, one Mizell brother or another would live on Sections 1 & 2, while maintaining Sections 4 & 5. The Mizells and the Mizell brothers have maintained the landscaping, kept cattle, planted vegetation and grass, and fertilized Sections 1, 2, 4 & 5. The Mizells have paid the taxes on the real property periodically throughout the years, but exclusively after Bill Pouncey's death in 2007.

[] Plaintiffs claim ownership of Sections 1, 2 and 4 of the [] Property through inheritance and/or adverse possession. Since the elder Mizells owned and the Plaintiffs have owned Sections 1, 2 and 4, they never needed to pay rent to anyone and they never did.

[] Since the mid-1960s and after Jimmie and Helen Mizell took possession and physical use of Sections 1, 2 and 4, none of the Defendants nor Emma Jean Pouncey and her husband, Bill Pouncey made any attempt to interrupt the Mizells' continuous use of Sections 1, 2 and 4 prior to 2020. Since the time that Plaintiffs began to use Sections 1, 2, 4 & 5, none of the Defendants made any attempt to institute an adverse suit prior to 2020 to recover 1, 2, 4 & 5.

21

<u>Defendants' Partial Motion for Summary Judgment</u>

Defendants filed a Partial Motion for Summary Judgment, addressing Plaintiffs' new lost deed doctrine claim and re-urging its prior motion for summary judgment challenging Plaintiffs' adverse possession/tacking claims. Defendants assert in the Partial Motion for Summary Judgment that James Mizell's deposition admission that his aunt Emma Jean Pouncey had full access to the Property until her death and that she was never excluded from any sections of the Property precludes any claim by Defendants of title through possession under any theory. As summary judgment evidence, the Defendants attached as exhibits the same exhibits attached to their earlier-filed motion for summary judgment, along with Plaintiffs' First Amended Initial Disclosures. In Plaintiffs' First Amended Initial Disclosures, Plaintiffs acknowledged that at the time they did not have a copy or description of a document in their possession, custody, or control to support their claim or defenses, and the Defendants note that Plaintiffs have still not disclosed any such document or description of such document despite ongoing discovery and that the case has been pending since April 3, 2022. Defendants argue that they have presented the 1966 deed of trust and release of lien showing their parents purchased the Property, and Plaintiffs have provided no evidence from persons with relevant knowledge regarding any alleged title instrument conveying title in the Property to Plaintiffs or their predecessors. Defendants contend that Plaintiffs cannot overcome summary

22

judgment as to their lost deed claim because they have presented no evidence of a long-asserted claim, no evidence of complete non-claim by the holder of apparent record title, and no evidence of lack of a claim by any other person over the same period. According to the Defendants, the lost deed doctrine has been generally applied where there is a gap in title and was historically used by parties who failed to provide title under adverse possession. Defendants contend that they are entitled to summary judgment as a matter of law because the lost deed doctrine cannot apply here because the record title owners of the land lived on the Property until 2014, less than 10 years before the filing of this lawsuit, and Plaintiffs' alleged predecessors lived on the Property with the record title owners until 2014.

Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment

Plaintiffs filed a Response to Defendants' Motion for Partial Summary Judgment, relying on the same evidence attached to their Response to Defendants' Motion for Summary Judgment and arguing that they have presented more than a scintilla of evidence to prove they acquired full title to Sections 1 and 2 of the Property under the lost deed doctrine or, in the alternative, adverse possession. Plaintiffs contend that they have established that they acquired title to Sections 1 and 2 of the Property under the lost deed doctrine because the doctrine does not require a specific time frame for possession but only requires "a long time of possession." As for the "long-standing and open claim" element of the lost deed doctrine,

Plaintiffs argue that James Mizell's affidavit's uncontroverted statements establish that Plaintiffs have a long-standing and open claim to Sections 1 and 2 of the Property because he states in his affidavit that Jimmie and Helen paid the taxes on the Property through the years and they exclusively used and occupied Sections 1 and 2 for over 53 years and 36 years, respectively, and the Mizells have exclusively used and controlled Sections 1 and 2 after the deaths of Jimmie and Helen Mizell by physically occupying the land, planting and fertilizing vegetation, and maintaining the landscaping. Plaintiffs argue that James's testimony is corroborated by the Affidavit of William Dewayne Mizell wherein he states that during the time the families and children lived on the Property, Jimmie and Helen Mizell's home was considered the gathering place for meetings, dinners, and celebrations and that Jimmie Mizell lived and worked on the Property and built a barn and ran cattle on it for a period of time. Regarding the non-claim and acquiescence element of the lost deed doctrine, Plaintiffs assert that James Mizell's affidavit provides uncontroverted testimony establishing that Bill and Emma Jean Pouncey nor the Defendants ever made a claim to Sections 1 or 2 of the Property and therefore acquiesced to Jimmie and Helen Mizell and the Plaintiffs' apparent adverse claim. Plaintiffs rely on James Mizell's statement in his affidavit that Jimmie and Helen Mizell took possession of Sections 1 and 2 through 2020 and neither Emma Jean or Bill nor the Defendants made any attempt to interrupt the Mizells' continuous use of Sections 1 and 2, and

24

Plaintiffs maintain that William Dewayne Mizell's affidavit and Mary Whisenant's affidavit corroborate this. Plaintiffs contend that a gap in title is not an element to a claim under the lost deed doctrine. As to their adverse possession claim, Plaintiffs argue that James Mizell's affidavit establishes that Jimme and Helen Mizell took possession and physical use of Sections 1 and 2 and none of the Defendants or Emma Jean Pouncey or Bill Pouncey never made any attempt to institute an adverse suit prior to 2020 to recover Sections 1 and 2. As for ouster, the Plaintiffs contend that the Pounceys parted with their title to Sections 1 and 2 when Jimmie and Helen Mizell took possession of Sections 1 and 2, and that Shirley Steele's testimony shows the Mizells' peaceable use and adverse possession of Section 1 to the exclusion of the Pounceys. Plaintiffs assert that the evidence indicates a cotenant relationship which supports Plaintiffs' claim under the lost deed doctrine.

Defendants' Reply and Objections to Plaintiffs' Response to Partial Motion for Summary Judgment

In their Reply and Objections to Plaintiffs' Response to Partial Motion for Summary Judgment, Defendants re-urge their previous arguments and object to William Dewayne Mizell's affidavit on the basis that he has not established how he has personal knowledge surrounding the purchase of the property and that his statements about what his mother told him in a letter about the purchase of the Property constitute hearsay within hearsay and violates the best evidence rule. Defendants also argue that William Dewayne Mizell's statement about Helen's

25

mother planning to provide a down payment with the Property with the proceeds from the sale of two homes she sold in New Hampshire is conclusory because he provided no basis for how he gained this knowledge. Defendants again objected to James Mizell's affidavit on the basis of the "sham affidavit rule" and objected to James's statement about the pooling of resources to purchase the property on the following bases: he failed to show basis for his personal knowledge of the facts, the purchase documents were the best evidence regarding the purchase of the Property, and under the dead man's rule, there is no corroborating testimony to support the statement of the pooling of resources by the siblings for the purchase of the Property. As for James Mizell's statement in his affidavit that his parents were "in actual peaceable, visible appropriation of possession of Sections 1 and 2 of the Property, which was open and notorious and commenced and continued under a claim of right that was inconsistent with and hostile to the claim of any other person from the year 1966 for Section 1 and 1969 for Section 2 to the date of their deaths[,]" the Defendants objected on the basis that this is a legal conclusion lacking underlying facts to support the inconsistent and hostile nature of the Mizell's possession of the Property. Defendants requested that the trial court strike the inadmissible portions of James's and William's affidavits.

Final Judgment

The trial court signed an Order Granting Defendants' Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. In its Final Judgment, the trial court stated that "[a]fter reviewing and considering all evidence on file in this Cause, this Court declares, Orders, Adjudges and Decrees" that Defendants are the "sole owners of the Property identified and described as 431 McAdams Vann Rd., Cleveland, Texas 77328." The trial court rendered a take nothing judgment in favor of the Defendants and noted that the trial court "considered the pleadings and depositions on file, together with the affidavits, and arguments of counsel, and finds that they show an absence of genuine issue of any material fact on the grounds urged by Plaintiffs' causes of action for Trespass to Try Title Cause of Action and the Lost Deed Doctrine." And the Final Judgment states, "summary judgment is hereby granted in favor of Defendants . . . as to all alleged causes of action."

Post-Judgment Motions and Appeal

Plaintiffs filed an Amended Motion for New Trial, which was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). Plaintiffs timely appealed the trial court's judgment.

Issues on Appeal

In their first issue, Appellants argue that they produced more than a scintilla of evidence raising genuine issues of material fact as to the existence of a proper claim to title to a portion of the Property (Sections 1 and 2) under the lost deed doctrine. In issue two, Appellants contend that they produced more than a scintilla of evidence raising genuine issues of material fact as to their adverse possession of Sections 1 and 2 of the Property.

Standard of Review and
Applicable Law Pertaining to Summary Judgments

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). A defendant can obtain a summary judgment by negating one or more elements of each theory of recovery, or by establishing all elements of an affirmative defense to each theory of recovery. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). We take as true all evidence favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When a party moves for both a traditional and no-evidence summary judgment, we first consider the no-evidence motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the non-movant fails to meet his burden under the no-evidence motion, there is no need to address the challenge to the traditional

motion because it necessarily fails. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

A no-evidence motion for summary judgment is essentially a pretrial motion for directed verdict, which we review for legal sufficiency. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). Once a no-evidence motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements identified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The nonmoving party must produce summary judgment evidence raising a genuine issue of material fact. Tex. R. Civ. P. 166a(i); *see Mack Trucks*, 206 S.W.3d at 582. A trial court must grant a no-evidence motion for summary judgment unless the nonmovant produces more than a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. Tex. R. Civ. P. 166a(i); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). If the evidence rises to a level that would allow reasonable and fair-minded people to differ in their conclusions, then more than a scintilla of probative evidence exists. *King Ranch*, 118 S.W.3d at 751. "The evidence does not create an issue of material fact if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014)). In evaluating whether more than a scintilla of

29

evidence exists, we must view the evidence in the light most favorable to the nonmovant. *Ford Motor Co.*, 135 S.W.3d at 601.

Lost Deed Doctrine

In their first issue, Appellants argue that they produced more than a scintilla of evidence raising genuine issues of material fact as to the existence of a proper claim to title to a portion of the Property (Sections 1 and 2) under the "lost deed doctrine." The doctrine of presumed lost deed or grant, which is also referred to as title by circumstantial evidence, has been described as a common law form of adverse possession. *Conley*, 356 S.W.3d at 765. "[The doctrine's] purpose is 'to settle titles where the land was understood to belong to one who does not have a complete record title, but has claimed [it] a long time.'" *Id.* (quoting *Purnell v. Gulihur*, 339 S.W.2d 86, 92 (Tex. App.—El Paso 1960, writ ref'd n.r.e.)). "'The rule is essential to the ascertainment of the very truth of ancient transactions. Without it, numberless valid land titles could not be upheld.'" *Id.* (quoting *Magee*, 221 S.W. at 257). As noted in *Balmorhea Ranches, Inc. v. Heymann*,

> [g]enerally, the doctrine applies when there is a gap in the chain of title and operates to create an evidentiary presumption that a deed may have been executed in favor of the party who has asserted ownership for a long time. *See Humphries v. Texas Gulf Sulphur Co.*, 393 F.2d 69, 75 (5th Cir. 1968). Long ago, the Supreme Court of the United States described the presumption in *Fletcher v. Fuller*:
>
>> The general statement of the doctrine . . . is that the presumption of a grant is indulged merely to quiet a long possession which might otherwise be disturbed by reason of the inability of the possessor to produce the muniments

30

> of title which were actually given at the time of the acquisition of the property by him or those under whom he claims, but have been lost, or which he or they were entitled to have at that time, but had neglected to obtain, and of which the witnesses have passed away, or their recollection of the transaction has become dimmed and imperfect . . . .

120 U.S. 534, 551 [] (1887).

> Generally, the application of the presumption is a question of fact, not law. *See Jeffus v. Coon*, 484 S.W.2d 949, 954 (Tex. App.—Tyler 1972, no writ). However, the presumption may be established as a matter of law in cases where the deeds are ancient and the evidence is undisputed. *See Howland v. Hough*, 570 S.W.2d 876, 879-80 (Tex. 1978). . . .

> The events to which the presumption of lost grant has been applied usually occur when there is a gap in title before the Twentieth century. *See, e.g.*, *Fletcher*, 120 U.S. at 542 (presuming a grant despite a gap in title from 1756 to 1768); *Howland*, 570 S.W.2d at 879 (presuming a grant despite a gap in title from 1845 to 1878); *Baumgarten v. Frost*, [] 186 S.W.2d 982, 984 (Tex. 1945) (presuming a grant despite a gap in title during the early 1880s).

656 S.W.3d 441, 448-49 (Tex. App.—El Paso, no pet.). To establish title by this doctrine, the evidence must show (1) a long asserted and open claim, adverse to that of the apparent owner; (2) nonclaim of the apparent owner; and (3) acquiescence by the apparent owner in the adverse claim. *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 366 (Tex. 2023); *Adams v. Slattery*, 295 S.W.2d 859, 868 (Tex. 1956); *Magee*, 221 S.W. at 257. The Texas Supreme Court has recently noted that, although the lost deed doctrine is generally applied when there is a gap in the chain of title, a gap in title is not an additional element required in establishing title under the lost deed doctrine. *See Van Dyke*, 668 S.W.3d at 366.

31

As to the first element of the lost deed doctrine, Appellants argue that the affidavit of James Mizell included uncontroverted statements regarding his and his predecessors' claim to Sections 1 and 2 of the Property, including that Jimmie and Helen Mizell paid the taxes on the Property, Jimmie and Helen Mizell have exclusively used and occupied Sections 1 and 2 for over 53 years and 36 years respectively; and that the Mizells have exclusively used and controlled Sections 1 and 2 since the deaths of Jimmie and Helen Mizell by physically occupying the land, planting and fertilizing vegetation, and maintaining the landscaping. Appellants contend that the affidavit of William Dewayne Mizell corroborates James Mizell's affidavit by (1) stating that during the time the families and their children lived on the Property, Jimmie and Helen Mizell's home was considered the gathering place for meetings, dinners, and celebrations; and (2) stating that Jimmie Mizell lived and worked on the Property, where Jimmie Mizell built a barn, and ran cattle on it for a period of time.

Here, it is undisputed that the 1966 Warranty Deed from Claude Lewis provides that the Property was conveyed to Bill and Emma Jean Pouncey as Grantees, and further that the 1966 Deed of Trust on the Property reflects Bill and Emma Jean Pouncey had mortgage on the Property and later that Deed of Trust was released. Appellants' summary judgment evidence indicates that Bill and Emma Jean Pouncey and Jimmie and Helen Mizell, along with their respective families,

32

lived on sections of the Property peacefully and that the families have never excluded each other from any sections of the Property. Additionally, based on the record, there is no evidence of any written agreement between Bill and Emma Jean Pouncey and Jimmie and Helen Mizell showing that the Mizells hold any title to any portion of the Property. At best, the evidence shows that the Pounceys and the Mizells lived together peacefully as tenants on the Property, but the only Deed and Deed of Trust on the Property shows the Pounceys to be the record title holders of the Property. Even assuming without deciding that Jimmie or Helen Mizell may have held a tenancy claim to some part of the Property, there is no evidence that their claim was adverse to the Pounceys ownership of any part of the Property or that the Pounceys ever acquiesced to an adverse claim of ownership to the Property from the Mizells or their heirs. Because Appellants failed to present more than a scintilla of evidence raising a genuine issue of material fact that they had a long asserted and open claim, adverse to that of the apparent owners, Appellees were entitled to summary judgment as a matter of law on Appellants' claim under the lost deed doctrine. *See* Tex. R. Civ. P. 166a(i); *Wal-Mart Stores, Inc.*, 92 S.W.3d at 506; *see also Van Dyke*, 668 S.W.3d at 366; *Adams*, 295 S.W.2d at 868; *Magee*, 221 S.W. at 257. Issue one is overruled.

Adverse Possession

In issue two, Appellants contend that they produced more than a scintilla of evidence raising genuine issues of material fact as to their adverse possession of Sections 1 and 2 of the Property.[3] An adverse possession claimant's use of the land "must constitute an actual and visible appropriation of the land such that the true owner is given notice of a hostile claim." *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990) (op. on reh'g); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (adverse possession requires "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."). "'The possession must be of such character as to indicate *unmistakably* an assertion of a claim of *exclusive* ownership in the occupant.'" *Rhodes*, 802 S.W.2d at 645 (emphasis in original) (quoting *Rick v. Grubbs*, 214 S.W.2d 925, 927 (1948)). "The test for hostility is whether the acts performed by the claimant on the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property." *Masonic Bldg. Ass'n of Hous., Inc. v. McWhorter*, 177 S.W.3d 465, 472 (Tex. App.—Houston [1st Dist.] 2005, no pet.)

---

[3] Appellants have abandoned any argument on appeal regarding any alleged ownership interest in what they designated as Sections 3, 4, and 5.

(citing *Winchester v. Porretto*, 432 S.W.2d 170, 174-75 (Tex. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.)).

In their Second Amended Petition, the live petition at the time the trial court granted summary judgment, Plaintiffs allege that they adversely possessed Sections 1 and 2 because during Jimmie and Helen Mizell's and Plaintiffs' occupation of those sections, no one claimed or attempted to claim an interest in those sections "as their own" for more than twenty years and their occupation "was continuously adverse" to Defendants' claim to the Sections 1 and 2 of the Property. According to the live pleading, Jimmie and Helen possessed sections 1 and 2 by improving and maintaining a house or mobile home located there, cultivated the landscaping, and personally resided there for over twenty-five years. In their pleadings, discovery responses, and summary judgment evidence, Plaintiffs assert that Jimmie and Helen were in possession of Sections 1 and 2 under a claim of right that was inconsistent with and hostile to any other person from 1966 to the date of their deaths.

In their Motion for Summary Judgment, Defendants argue that Plaintiffs cannot provide evidence that Jimmie and Helen Mizell at any time entered the Property with a claim of right that is hostile to and inconsistent with the claim of ownership by the Pounceys. In Defendants' Reply and Objections to Plaintiffs' Response to Partial Motion for Summary Judgment, as well as on appeal, Defendants argue that, among other things, Plaintiffs produced no evidence of their hostile or

35

exclusive possession of Sections 1 and 2. In their reply brief, Appellants maintain for the first time on appeal that they do not have to show hostility or exclusivity to succeed on their adverse possession claim. According to Appellants, the requirements of proving hostility and exclusivity would only apply in a situation where Appellees had given Appellants permission to be on the property, and Appellants dispute that they were occupying the Property with permission of Appellees. This argument is contrary to the allegations in the pleadings and summary judgment record, wherein Appellants state that their parents and the Pounceys mutually agreed they would purchase the Property and live on the Property.

We disagree with Appellants' assertion that they are not required to show that their possession was hostile or exclusive. "'Adverse possession' is defined in the Civil Practice and Remedies Code as 'an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person.'" *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 193 (Tex. 2003) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1)). Permissive occupancy is not adverse. *Shultz v. Shatto*, 237 S.W.2d 609, 613-14 (Tex. 1951); *Rubio v. Walsh*, No. 03-13-00698-CV, 2015 Tex. App. LEXIS 8456, at *5 (Tex. App.—Austin, Aug. 13, 2015, no pet.) (mem. op.). If there is an agreement allowing one to occupy the property, then such possession is neither adverse nor hostile. *Rubio*, 2015 Tex. App. LEXIS 8456, at *5; *Wright v. Wallace*,

36

700 S.W.2d 269, 271 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).[4] Possession of land by adverse claimants who entered upon the land with permission of the record title owner cannot establish adverse possession until the adverse claimants give notice of the hostile nature of their possession. *Rubio*, 2015 Tex. App. LEXIS 8456, at *5; *Wright*, 700 S.W.2d at 271. "[T]here must be adverse possession, not just adverse *beliefs*[,]" and the possession must be "'hostile to' the claims of all others." *Tran v. Macha*, 213 S.W.3d 913, 914 (Tex. 2006) (per curiam) (emphasis in original). Merely entering upon the land with the belief of ownership, without asserting a claim of right at the outset, does not suffice as evidence of hostile adverse possession. *Bustamante v. Gutierrez Flores*, 770 S.W.2d 934, 937 (Tex. App.—San Antonio 1989, no writ) (When an adverse claimant enters upon land without asserting a claim at the outset, his possession of the land was not "'commenced under a claim of right inconsistent with and hostile to the claim' of the owner within the meaning of the ten year statute."). For there to be "hostile" use, "there must be an intention to claim property as one's own to the exclusion of all others[.]" *Tran*, 213 S.W.3d at 915; *see also Turner v. Mullins*, 162 S.W.3d 356, 367 (Tex. App.—Fort Worth 2005, no pet.) (exclusive possession of the land is required

---

[4] We also note that activities such as "mowing the grass," "planting flowers," and "maintaining a hedge" "do[] not constitute a hostile character of possession sufficient to give notice of an exclusive adverse possession[.]" *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985).

to support an adverse-possession claim and the adverse-possession claimant must wholly exclude the owner of the property). Joint or common possession by the adverse possession claimant and the owner defeats the requisite quality of exclusiveness. *Turner*, 162 S.W.3d at 367; *W. End API, Ltd. v. Rothpletz*, 732 S.W.2d 371, 375 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

As for Appellants' argument that the Mizells' possession of Sections 1 and 2 of the Property was agreed to between all the parties, pursuant to an oral agreement between the Pounceys and the Mizells, a party claiming adverse possession against a cotenant must prove his possession was adverse and prove some sort of ouster– actual or constructive. *See Todd v. Bruner*, 365 S.W.2d 155, 159 (Tex. 1963). In other words, a cotenant's possession of property is not adverse until the tenancy has been repudiated and "notice of such repudiation has been brought home to the titleholder." *Rife v. Kerr*, 513 S.W.3d 601, 616-17 (Tex. App.—San Antonio 2016, pet. denied) (quoting *Tex-Wis Co. v. Johnson*, 534 S.W.2d 895, 899 (Tex. 1976)). The Texas Supreme Court has defined ouster, in the context of cotenancies, as "unequivocal, unmistakable, *and hostile acts* the possessor took to disseize other cotenants." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 70 (Tex. 2011) (emphasis added) (citing *King Ranch, Inc.*, 118 S.W.3d at 756; *Todd*, 365 S.W.2d at 159-60). Regardless of whether the Mizells' possession of Section 1 and 2 was as a cotenant or by permission, Appellants had the burden to provide more than a scintilla of

material evidence raising a genuine issue of material fact that the Mizells' possession was hostile to the Pounceys in order to succeed on their adverse possession claim.

The "evidence" Plaintiffs point to in their response to the motion for summary judgment that their parents possession was "hostile" is James Mizell's statement in his affidavit that his parents were "in actual peaceable, visible appropriation of possession of Sections 1 and 2 of the Property, which was open and notorious and commenced and continued under a claim of right that was inconsistent with and hostile to the claim of any other person from the year 1966 for Section 1 and 1969 for Section 2 to the date of their deaths." The Defendants objected to this "evidence" in the trial court on the basis that the statement is a legal conclusion lacking underlying facts to support the inconsistent and hostile nature of the Mizell's possession of the Property. On appeal, Defendants argue that James Mizell's affidavit and William Dewayne Mizell's affidavit are legally insufficient. Defendants did not secure a ruling on their objection in the trial court. However, an objection to an affidavit on the ground that it states only a legal conclusion is one that relates to a defect of substance, so Defendants' alleged legal deficiencies are properly before this Court. *See Ramirez v. Transcon. Ins. Co.*, 881 S.W.2d 818, 828-29 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (concluding objection that summary judgment affidavit contained only legal conclusions was preserved for appeal even though the objecting party failed to obtain a ruling from the trial court).

An improper legal conclusion is one that does not provide underlying facts to support the conclusion. *See Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (attorney's affidavit that stated only legal conclusions that "I acted properly[,]" "have not violated the [DTPA][,]" and "did not breach my contract" did not provide underlying basis or reasoning to support conclusions and would not support summary judgment). Legal conclusions do not suffice as summary judgment evidence. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Beta Supply, Inc. v. G.E.A. Power Cooling Sys., Inc.*, 748 S.W.2d 541, 542 (Tex. App.—Houston [1st Dist.] 1988, writ denied). We agree that James Mizell's statement is incompetent summary judgment proof as to the "hostile" element. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1); *see also Tran*, 213 S.W.3d at 914; *Rubio*, 2015 Tex. App. LEXIS 8456, at *5; *Wright*, 700 S.W.2d at 271. Appellants presented no competent evidence that Jimmie Mizell or Helen Mizell or Appellants ever ousted or excluded Bill or Emma Jean Pouncey or the Appellees from Sections 1 and 2. In fact, Mary Whisenant's affidavit, William Dewayne Mizell's affidavit, Shirley Steele's deposition testimony, and James Mizell's deposition testimony provide evidence that neither Jimmie nor Helen Mizell nor the Appellants ever excluded Bill or Emma Jean Pouncy or Appellees from Sections 1 or 2, and therefore, the evidence conclusively negates the "hostile and exclusive" elements. Viewing the evidence in the light most favorable to the Appellants, Appellants failed to produce more than a scintilla of

40

evidence raising a genuine issue of material fact that their possession was hostile or to the exclusion of all others.[5] *See Ford Motor Co.*, 135 S.W.3d at 601; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1); *Tran*, 213 S.W.3d at 914. Issue two is overruled.

Having overruled Appellants' issues, we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on May 22, 2025
Opinion Delivered July 16, 2026

Before Johnson, Wright and Chambers, JJ.

---

[5] Because we have concluded that the Appellants have failed to produce more than a scintilla of evidence raising a genuine issue of material fact that their possession was hostile and to the exclusion of all others, we need not address Defendants' arguments as to the other elements of Appellants' adverse possession claim. *See* Tex. R. App. P. 47.1.